**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CAPITAL CITY CAB SERVICE, INC.,** | : | |
| **and AYAL SALAME** | : | |
| **Plaintiffs,** | : | **CIVIL ACTION NO. 1:06-CV-00671** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **SUSQUEHANNA AREA REGIONAL** | : | |
| **AIRPORT AUTHORITY, et al.,** | : | |
| **Defendants.** | : | |

**MEMORANDUM**

Plaintiff Capital City Cab Service, Inc. ("Capital City") is a Pennsylvania corporation that provides call-and-demand taxi services in Cumberland, Dauphin, and York counties. Plaintiff Ayal Salame is the president and owner of Capital City. Defendant Susquehanna Area Regional Airport Authority ("SARAA") is a municipal authority enacted pursuant to the Municipal Authorities Act of 1945, as amended, 53 Pa. Cons. Stat. § 5601 et seq., and charged with the operation of Harrisburg International Airport ("HIA"), located in Dauphin county. At all relevant times, Defendants Alfred Testa and Randy Hicks were both employees of SARAA, with Defendant Testa serving as Director of Aviation. Defendant Salgals, Inc., is the owner-operator of American Taxi, a competitor of Capital City.

Before this Court is Defendants' motion to dismiss Plaintiffs' amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]  (Doc. No. 11.)  The motion has been fully briefed and is ripe for disposition.

---

[1] Salgals, Inc., did not join in the present motion to dismiss.

# I.  BACKGROUND

## A.  Factual Background[2]

The dispute before the Court involves outbound taxicab fares originating at Harrisburg International Airport.  Until April 1, 2004, cabs seeking outbound fares would freely enter the HIA garage facility and wait for passengers in a queue-line.  However, on August 2, 2004, SARAA and American Taxi entered into a contract that conveyed exclusive rights to American Taxi to "pick up passengers at the terminal building."  (Doc. No. 9-2, at 1.)  In exchange for fees "based upon a percentage of gross revenues," SARAA agreed to provide American Taxi with exclusive access to the HIA terminal as well as a number of parking spaces in the garage facility for off-duty taxicabs.  (Id. at 2.)  Although Capital City submitted a bid on the exclusive contract, the Plaintiffs allege that

> [SARAA] illegally collud[ed]  with Salgals in its contract "negotiations," as evidenced by SARAA manipulating its "insurance requirements" by, first requiring Capital City and all providers to demonstrate an [sic] level of insurance both overwhelmingly expensive and difficult to acquire, and then, once the contract was granted to American Taxi, dropping those required insurance levels, over eighty percent, to those initially offered by Capital City.  This was to ensure that Salgals would be the "winning bidder."

(Doc. No. 9, ¶ 22(c).)

The exclusive operating agreement, according to Plaintiffs, gives American Taxi such a competitive advantage over other common carriers that it precludes effective competition at

---

[2] The following facts, which are accepted as true for purposes of this decision, are taken from Plaintiffs' amended complaint and exhibits incorporated by reference.

HIA.[3]  Plaintiffs' amended complaint includes allegations that SARAA has enforced the contract on several occasions by preventing Capital City from using the queue-line and garage facilities. (Doc. No. 9, ¶¶ 15-17.)  Moreover, Capital City alleges that the contract had the effect of denying "Capital City access to outbound fares at the HIA facility, relegating Capital City to an area of HIA's multitiered garage where such fares are difficult, if not impossible to acquire." (Doc. No. 9, ¶ 11.)  Finally, Capital City alleges that it, like other common carriers, must pay a $10 fee to use the HIA garage facility, thereby giving American Taxi a commercial advantage. (Doc. No. 9, ¶ 24.)

Plaintiffs allege that Capital City had a legal right to operate a taxicab service because the Pennsylvania Public Utilities Commission had certified it do so irrespective of the exclusive operating agreement between SARAA and American Taxi.  (Doc. No. 9, ¶ 14.)  Furthermore, the amended complaint includes an assertion that "[Plaintiff] Salame is an Israeli-born American citizen, and many of Plaintiff's drivers speak Arabic as their first language, though Citizens or legal resident aliens themselves."  (Doc. No. 9, ¶ 37.)  Plaintiffs contend that the Defendants' actions to "deny [Capital City] lawful access to public facilities on the HIA property" (Doc. No. 9, ¶ 40) despite Plaintiffs' legal right to operate a taxicab service and purported membership in a protected class, effectively "den[ied] both Capital City and Salame the equal protection of the laws" (Doc. No. 9, ¶ 41).

---

[3] Taxicabs are still able to drop off inbound passengers and pick up previously scheduled outbound fares.

B.      **Procedural Background**

On March 31, 2006, Plaintiffs filed a complaint with this Court.  (Doc. No. 1.)  On June

6, 2006, Defendants moved to dismiss Plaintiffs' complaint pursuant to Rule 12(b)(6) and moved

for sanctions pursuant to Rule 11(c).  (Doc. Nos. 7, 8.)  On June 16, 2006, Plaintiffs filed an

amended complaint.  (Doc. No. 9.)  Because Defendants had not filed briefs in support of either

motion as required by Local Rule 7.5, the Court deemed both motions withdrawn on June 28,

2006.  (Doc. No. 10.)  On July 6, 2006, the Defendants filed a motion to dismiss Plaintiffs'

amended complaint pursuant to Rule 12(b)(6).  (Doc. No. 11.)  The motion has been fully briefed

by both parties (Doc. Nos. 16, 19, 21) and is ripe for disposition.  On September 6, 2006, the

Court heard oral argument.  For the following reasons, the Court will grant the motion and

dismiss Plaintiffs' amended complaint.

## II.     STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is properly granted

when, taking all factual allegations and inferences as true, the moving party is entitled to

judgment as a matter of law.  Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir.

1990).  The burden is on the moving party to show that no claim has been stated.  Johnsrud v.

Carter, 620 F.2d 29, 33 (3d Cir. 1980).   A court must "examine whether, under any reasonable

reading of the complaint, the plaintiff may be entitled to relief."  Hill v. Borough of Kutztown,

455 F.3d 225, 233 (3d Cir. 2006) (quoting Delaware Nation v. Pennsylvania, 446 F.3d 410, 415

(3d Cir. 2006)).  However, "a court need not credit a complaint's 'bald assertions' or 'legal

conclusions' when deciding a motion to dismiss."  Morse v. Lower Merion Sch. Dist., 132 F.3d

902, 906, 908 (3d Cir. 1997). Rather, a court must only determine "whether the claimant is

entitled to offer evidence to support the claims." Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc., 280 F.3d 278, 283 (3d Cir. 2002) (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir. 1997)).

## III.   DISCUSSION

Plaintiffs allege two separate claims against the Defendants.  First, Plaintiffs allege that the Defendants acted in violation of the federal Sherman and Clayton Acts, 15 U.S.C. § 1 et seq., and seek monetary relief.  Second, Plaintiffs allege that Defendants violated Plaintiffs' right to equal protection under the Fourteenth Amendment.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Defendants seek to dismiss both counts, and this Court will address both in turn.

### A.       Count I - Antitrust

In Count I of the amended complaint, Plaintiffs allege that Defendants violated federal antitrust laws by entering into an anticompetitive, exclusive operating agreement with American Taxi.  Defendants move to dismiss the Plaintiffs' antitrust claims on three grounds.  First, Defendants argue that they are shielded from antitrust liability under the judicially fashioned "state action" doctrine.  Second, Defendants contend that Plaintiffs cannot state a claim for relief under the federal antitrust laws.  Third, Defendants assert that the Local Government Antitrust Act of 1984 ("LGAA"), Pub. L. No. 98-544, 15 U.S.C. §§ 34-36, bars Plaintiffs from seeking monetary relief in an antitrust action.[4]

#### 1.       State-Action Doctrine

Defendants maintain that the state-action doctrine exempts SARAA from federal antitrust

---

[4] Although the Court finds that the state-action doctrine does not apply to the facts alleged in this case, the Court will not reach the merits of Plaintiffs' claims because the LGAA immunizes SARAA from suits for damages.

liability.  The state-action doctrine, as first established by the Supreme Court in <u>Parker v. Brown</u>, 317 U.S. 341 (1943), is a recognition that Congress did not intend federal antitrust laws to restrain state action.[5]  <u>A.D. Bedell Wholesale Co. v. Philip Morris Inc.</u>, 263 F.3d 239, 255 (3d Cir. 2001).  The doctrine is "grounded in federalism and respect for state sovereignty," <u>Mariana v. Fisher</u>, 338 F.3d 189, 201 (3d Cir. 2003), and has "evolved based upon 'the principle of freedom of action for the States, adopted to foster and preserve the federal system.'"  <u>Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.</u>, 22 F.3d 1260, 1265 (3d Cir. 1994) (quoting <u>FTC. v. Ticor Title Ins. Co.</u>, 504 U.S. 621, 633 (1992)).  The Third Circuit has explained that "[w]hen a state clearly acts in its sovereign capacity it avoids the constraints of the Sherman Act and may act anticompetitively to further other policy goals.  For example, state governments frequently sanction monopolies to ensure consistent provision of essential services like electric power, gas, cable television, or local telephone service."  <u>Bedell</u>, 263 F.3d at 255 (internal citations omitted).

Local governmental entities, although they are not themselves exempt from antitrust liability under <u>Parker</u>, are shielded by the state-action doctrine when a state authorizes their actions.  <u>City of Lafayette v. Louisiana Power & Light Co.</u>, 435 U.S. 389, 412-13 (1978).  A local governmental entity is exempt from federal antitrust laws when "it is engaging in the challenged activity pursuant to a clearly expressed state policy."  <u>Town of Hallie v. City of Eau Claire</u>, 471 U.S. 34, 40 (1985).  Yet to enjoy the exemption, "[i]t is not necessary . . . for the state legislature to have stated explicitly that it expected the [entity] to engage in conduct that

---

[5] The state-action doctrine is sometimes referred to as "Parker immunity."  But as the Fifth Circuit has cautioned, states are not "immune" from antitrust laws, but rather are exempted from them.  <u>Surgical Care Ctr. of Hammond v. Hosp. Svc. Dist. No. 1 of Tangipahoa</u>,171 F.3d 231, 234 (5th Cir. 1999) (<u>en</u> <u>banc</u>).

would have anticompetitive effects."  Id.  Action of a local government entity is protected as long as the "suppression of competition is the 'foreseeable result' of what the [enabling] statute authorizes."  City of Columbia v. Omni Outdoor Advertising, 499 U.S. 365, 373 (1991).  For SARAA to enjoy protection under the state-action doctrine, it must therefore show that its actions were authorized by state law, and prove that it acted  "pursuant to state policy to displace competition."  Hallie, 471 U.S. at 38-39 (quoting Lafayette, 435 U.S. at 413).

The key issues under the state-action doctrine are therefore whether: (1) SARAA had the power to enter into exclusive contracts; and (2) it was "foreseeable" that anticompetitive action would occur under the established regulatory framework.  To resolve these questions, the Court must turn to the statutory authority under which SARAA operates.

### a.      The Municipality Authorities Act

It is undisputed that SARAA is a municipal authority enabled pursuant to the Municipal Authorities Act, 53 Pa. Cons. St. §§ 5601-5622 ("MAA").  The specific enabling provision of the MAA for SARAA provides that:

> (a) Every authority incorporated under this chapter shall be a body corporate and politic and shall be for the purposes of financing working capital; acquiring, holding, constructing, financing, improving, maintaining and operating, owning or leasing, either in the capacity of lessor or lessee, projects of the following kind and character and providing financing for insurance reserves: . . . (3) Transportation, marketing, shopping, terminals, bridges, tunnels, flood control projects, highways, parkways, traffic distribution centers, parking spaces, airports and all facilities necessary or incident thereto.

53 Pa. Cons. Stat. § 5607 (emphasis added).

The MAA further provides that a municipal authority has powers to "make contracts of every name and nature and to execute all instruments necessary or convenient for the carrying on

of its business," "do all acts and things necessary or convenient for the promotion of its business and the general welfare of the authority to carry out the powers granted to it by this chapter or other law," and to "adopt rules and regulations to provide for the safety of persons using facilities of an airport authority pertaining to vehicular traffic control."  53 Pa. Cons. Stat. § 5607(d)(13), (17), (28).

Taken as a whole, the plain language of these provisions confers broad authority to SARAA to control facilities related to Harrisburg International Airport.  Moreover, Pennsylvania courts have previously held that "the Municipal Authorities Act clearly provides municipal authorities with wide discretion in determining how to conduct their business."  Helmerich Drive-It-Yourself, Inc. v. Erie Mun. Airport Auth., 612 A.2d 562, 565 (Pa. Commw. Ct. 1993).

Indeed, the Pennsylvania Commonwealth Court recently suggested that SARAA had the authority to enter into the precise exclusive arrangement presented before this Court. Susquehanna Area Reg'l Airport Auth. v. Pa. Pub. Util. Comm'n, No. 2516 C.D. 2005, slip op. at 10 (Pa. Commw. Ct. Nov. 21, 2006) ("SARAA v. PUC").  In that case, Capital City filed a complaint with the Pennsylvania Public Utilities Commission ("PUC"), alleging that SARAA lacked the authority to enter into the exclusive arrangement because it imposed restrictions upon certified taxicab companies.  Id. at 5.  The PUC agreed with Capital City that SARAA did not have authority to exclude Capital City because the PUC had exclusive authority over Capital City's "service area."  Id. at 6.  Accordingly, the PUC directed SARAA to permit Capital City to pick up outgoing fares despite the exclusive arrangement with American Taxi.  The Commonwealth Court rejected the PUC's position, holding that "the PUC lacks authority to direct either SARAA or American Taxi to abandon their respective rights and obligations under

the Exclusive Agreement."  Id. at 22. Moreover, in reaching that holding, the Commonwealth

Court expressed its agreement with SARAA "that its actions fall squarely within its powers

granted under the Municipal Authorities Act."  Id. at 10.

Even though the Commonwealth Court opined that the MAA provided SARAA with the

authority to enter the exclusive arrangement at issue before this Court, the Commonwealth Court

limited its holding, acknowledging that: "[t]he real question [before the court was] whether

SARAA's regulations or the Exclusive Agreement violate any provision of the Public Utility

Code."  Id. at 11.  The Commonwealth Court decision therefore does not squarely address

whether the MAA actually provides SARAA with the authority to enter into the exclusive

arrangement with American Taxi.  Accordingly, this Court's analysis cannot stop here.  The

Court must look to the entirety of the MAA before deciding whether SARAA had the authority

to enter into the exclusive contract.

### b.        MAA's limiting provision

While the MAA affords SARAA wide discretion in regulating its affairs, Plaintiffs argue

that a full reading of the MAA prohibits SARAA from entering into the exclusive contract.  In

contrast to the generally broad grant of power to municipal authorities, the MAA explicitly states

that municipal authorities are not intended to negatively affect existing businesses.  Specifically,

the MAA includes the following limiting provision:

> The purpose and intent of this chapter being to benefit the people of
> the Commonwealth by, among other things, increasing their
> commerce, health, safety and prosperity and not to unnecessarily
> burden or interfere with existing business by the establishment of
> competitive enterprises; none of the powers granted by this chapter
> shall be exercised in the construction, financing, improvement,
> maintenance, extension or operation of any project or projects or
> providing financing for insurance reserves which in whole or in part

> shall duplicate or compete with existing enterprises serving
> substantially the same purposes.

53 Pa. Cons. Stat. § 5607(b)(2) (emphasis added).  According to Plaintiffs, this limiting

provision suggests that SARAA cannot enter into exclusive contracts.

Pennsylvania courts have not had much occasion to address the meaning of the MAA's

limiting provision in the context of competition between municipal authorities and private

enterprises.  In most cases, courts have ruled that the provision simply did not apply, rather than

clarify its meaning.  See Dauphin County Gen'l Auth. v. Dauphin County Bd. of Assessments,

768 A.2d 895, 898 (Pa. Commw. Ct. 2001) (municipal authority's "acquisition of the properties

which competed with existing enterprises" not covered by limiting provision); Thompson

Appeal, 233 A.2d 237, 239 (Pa. 1967) ("[T]he deliberate omission of the power to acquire and

hold property shows a clear legislative design that the [limiting provision] was not to be a

restriction upon the authority's right to condemn."); see also Program Admin. Servs., Inc. v.

Dauphin County Gen'l Auth., 874 A.2d 722, 727 n.4 (Pa. Commw. Ct. 2005) (authority that

provided a school district with financing akin to a private bank is specifically exempted from

limiting provision).

At first glance, the language of the limiting provision would seem to support Plaintiffs'

position that although the MAA authorizes SARAA to enter into contracts, it does not

"anticipate exclusive contracts, where multiple providers both exist and can be used."  (Doc. No.

19, at 5.)  However, a close reading of the provision – "compete with existing enterprises serving

substantially the same purposes" – suggests that the MAA only prohibits municipal authorities

from competing directly with existing enterprises.

This reading is supported by ample authority in Pennsylvania case law.  In <u>Thompson Appeal</u>, the Pennsylvania Supreme Court explained that the "primary purpose of the [limiting provision] is to protect businesses which will be competing with the [authority's] operations." 233 A.2d at 237.  Later, in <u>Para Transit Corp. v. Monroe County</u>, the Commonwealth Court of Pennsylvania rejected a plaintiff's contention that a municipal authority's decision to institute "scheduled route service system" on its bus lines violated the MAA because it would ultimately displace plaintiff's taxicab service.  468 A.2d 548, 550 (Pa. Commw. Ct. 1983).  Upholding the authority's decision, the court stated that:

> The issue thus presented is <u>whether the services provided for by the County do in fact duplicate or compete with the enterprises</u> of Karpe. If the services provided by the County's new scheduled route service are distinct, there is no violation of the Municipal Authorities Act and no de facto taking of Karpe's property.

<u>Id.</u> (emphasis added).

By prohibiting direct competition between private entities and municipal authorities, the limiting provision balances the important public role of municipal authorities with "the unfair competitive advantage that would be enjoyed by municipal authorities, in light of their exemption from property taxation and ability to raise capital via the issuance of tax-free bonds, and freedom from the substantial expense associated with regulation."  <u>Chester Water Auth. v. Pennsylvania Pub. Util. Comm'n</u>, 868 A.2d 384, 389-90 (Pa. 2005) (internal citations omitted).

While the Court acknowledges that there might be circumstances where a municipal authority could be so intertwined with a contractor so as to compete directly with existing business enterprises, Plaintiffs' allegations do not support a finding that this is such a case.  <u>See, e.g.</u>, <u>Northeast Jet Ctr., Ltd., v. Lehigh-Northampton Airport Auth.</u>, 767 F. Supp. 672, 682 (E.D.

Pa. 1991) ("[a]ccording to the allegations in the amended complaint, the Airport Authority, in concert with Dynair Fueling, Inc., is alleged to be competing with the plaintiff in the provision of ground-based aviation support services.").  In the case sub judice, Plaintiffs allege that SARAA gave American Taxi an unfair competitive advantage through an exclusive operating agreement. (Doc. No. 9, ¶¶ 21-25.)  Plaintiffs do not allege that SARAA is attempting to operate in the taxicab market, but rather that it has favored one company over another with respect to an operating agreement.  Accordingly, the Court finds no basis for a determination that SARAA exceeded the broad discretion afforded it under the MAA by entering into an exclusive contract.

### c.     The "foreseeability" of anticompetitive conduct

As stated above, application of state-action doctrine requires the resolution of two issues: (1) whether SARAA had the power to enter into exclusive contracts; and (2) whether it was "foreseeable" that anticompetitive conduct would occur under the MAA.  Thus, even though SARAA acted within its authority by entering into an anticompetitive contract, the Court must determine whether the "foreseeable" result of the MAA was to displace application of the antitrust laws.  Upon consideration of precedent in the Third Circuit and elsewhere, the Court concludes that displacement of the antitrust laws is not a foreseeable result of the MAA under the facts alleged in this case.

When applying this test in cases where states delegate broad corporate powers, courts tend to improperly equate foreseeability with economic reasonableness.  Indeed, two leading antitrust scholars have explained the inherent difficulty in applying the foreseeability test when a state has delegated broad powers:

> Undoubtedly, many decisions inferring a broad immunity from general corporate powers are driven by the belief that no antitrust

12

> violation has occurred.  But in that case the proper solution is
> dismissal on the antitrust merits, not finding authorization to engage
> in anticompetitive acts from the grant of general corporate powers.
> We would thus disagree with decisions holding or suggesting that the
> power to buy and sell property implies the power to enter into
> otherwise unlawful mergers, that the power to acquire intellectual
> property rights implies the power to commit patent misuse or other
> antitrust violations, or that the bare power to make contracts implies
> the power to enter into anticompetitive exclusive arrangements.  On
> situations in the last class, the power to contract certainly implies the
> power to enter into exclusive provider agreements, because the great
> majority of such agreements are lawful.  <u>But one would not assume
> without additional clarification that such authority included the power
> to enter into the occasionally unlawful agreement</u>.

P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and their

Application ¶ 225 (2005) (emphasis added).

The Supreme Court in <u>Community Communications Co. v. City of Boulder</u>, expressly

rejected the notion that a state's delegation of broad corporate powers is sufficient for a

municipality to seek shelter in the state-action doctrine.  455 U.S. 40 (1982).  In <u>Boulder</u>, the

Supreme Court held that a municipality acting pursuant to home-rule authority, which conferred

"the full right of self-government in both local and municipal matters," was not covered by the

state-action doctrine when attempting to regulate the cable-television market.  <u>Id.</u> at 54-56.

Specifically, the Court held that:

> [T]he requirement of "clear articulation and affirmative expression"
> is not satisfied when the State's position is one of mere <u>neutrality</u>
> respecting the municipal actions challenged as anticompetitive.  A
> State that allows its municipalities to do as they please can hardly be
> said to have "contemplated" the specific anticompetitive actions for
> which municipal liability is sought.  Nor can those actions be truly
> described as "comprehended within the powers <u>granted</u>," since the
> term, "granted," necessarily implies an affirmative addressing of the
> subject by the State.

Id. at 55 (emphasis in original).[6]

Thus, a court cannot simply determine that the state's authorizing statute is neutral to the possibility of anticompetitive conduct.  Neither is it necessary to show that the enabling statute explicitly condoned anticompetitive conduct.  Instead, a court must satisfy itself "that anticompetitive effects logically would result from this broad authority to regulate."  Hallie, 471 U.S. at 42 (emphasis added); see also Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist., 940 F.2d 397, 400 (9th Cir. 1991).  The court's inquiry must therefore focus not on whether SARAA is empowered to engage in anticompetitive conduct, but rather more narrowly on whether the MAA evinces an intent of the Pennsylvania legislature to permit municipal authorities to act in contravention of the antitrust laws.

The Third Circuit has been careful to avoid equating broad delegations of power with foreseeability of anticompetitive conduct in the state-action doctrine context.  In Hancock Industries v. Schaeffer, the court held that the state-action doctrine applied when the Chester County Solid Waste Authority's decided to exclude out-of-county waste from the Lanchester Landfill.  811 F.2d 225, 232 (3d Cir. 1987).  In reaching its conclusion, the court did not rely solely on the fact that the Pennsylvania Solid Waste Management Act "effect[ed] a broad

_____

    [6] Although the Local Government Antitrust Act protects municipalities from antitrust liability for damages even when acting pursuant to home-rule authority, thereby superseding the Court's holding in Boulder, see Montauk-Caribbean Airways, Inc. v. Hope, 784 F.2d 91, 94-95 (2d Cir. 1986), the LGAA does not apply to claims for injunctive relief, nor does it modify the appropriate scope of analysis for purposes of the state-action doctrine.  Notably in Hallie, which post-dated the passage of the LGAA, the Supreme Court distinguished Boulder as follows: "[Boulder's enabling authority] simply did not address the regulation of cable television.  Under Home Rule the municipality was to be free to decide every aspect of policy relating to cable television, as well as policy relating to any other field of regulation of local concern.  Here, in contrast, the State has specifically authorized Wisconsin cities to provide sewage services and has delegated to the cities the express authority to take action that foreseeably will result in anticompetitive effects."  472 U.S. at 43.

delegation of authority" to a municipality to manage the disposal of waste within its borders.  <u>Id.</u> at 233.  The court went beyond the Solid Waste Management Act's broad delegation of power and focused instead on the nature of the action within the municipal authority's field of regulation to determine that:

> On its face, the exclusion of out-of-county waste from a landfill acquired by a municipal authority organized to fulfill a county's obligation to provide for disposal of that county's waste appears logically to result from the duty placed upon the municipality by the state statute.  Indeed, it would appear illogical to assume that the legislature contemplated that a municipal authority-owned landfill would be required to accept waste from other municipalities, thus shifting the burden established by [statute] on to which municipality acquired a landfill.

<u>Id.</u> (emphasis added).  Notably, the court did not rely solely on the authority's express power to "acquire and operate solid waste disposal facilities" but focused its analysis on the fact that the defendants were "compelled by the Pennsylvania statute to provide for the disposal of municipal waste [and as the Supreme Court] noted in <u>Hallie</u>, 'compulsion affirmatively expressed may be the best evidence of state policy.'"  <u>Id.</u> (quoting <u>Hallie</u>, 471 U.S. at 45-46).

Similarly, in <u>Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.</u>, the Third Circuit held that the state-action doctrine exempted the Pennsylvania Power & Light Co. ("PP&L") from antitrust liability "for offering builders and developers cash grants and other incentives, and for offering consumers a special electric rate for installation of high-efficiency electric heating systems."  22 F.3d 1260, 1263 (3d Cir. 1994).  However, the court "also conclude[d] that PP&L [was] not immune from antitrust liability to the extent it made these offers contingent upon 'all-electric development agreements.'"  <u>Id.</u>  In reaching this conclusion, the court did not rely on the Pennsylvania Public Utilities Commission's broad statutory authority to regulate public utilities

or the inherent corporate power of PP&L to provide incentives.  Instead, the court pointed to a

specific requirement to consider programs that would include "educational, audit, loan, rebate,

third-party financing and load management efforts to shift load from peak to off-peak periods.

66 Pa. Cons. Stat. Ann. § 524(a)(3)."  Id. at 1267.  From this, the Third Circuit reasoned that:

> Permitting companies to grant loans or rebates for energy-savings
> systems could easily be foreseen to provide one company with a
> competitive advantage over another, whether the other company
> provides the same or a competing service.  Therefore, it is reasonably
> foreseeable that rebates, loans and other load management programs
> utilities are required to consider could have anticompetitive effects.

Yeager's Fuel, 22 F.3d at 1268.

Together, Hancock Industries and Yeager's Fuel require that the mere delegation of

operational authority is itself insufficient to support a finding that a state intended to displace the

antitrust laws.  Accord Surgical Care Ctr. of Hammond v. Hosp. Svc. Dist. No. 1 of Tangipahoa,

171 F.3d 231, 235 (5th Cir. 1999) (en banc) ("Thus arises a distinction between a statute that in

empowering a municipality necessarily contemplates the anticompetitive activity from one that

merely allows a municipality to do what other businesses can do.").  The proper test for

foreseeability is whether the "challenged restraints are reasonably related to an [entity's] express

powers and reasonably designed to promote the state aims with a designated field of regulation."

Hybud Equip. Corp. v. City of Akron, 742 F.2d 949, 960 (6th Cir. 1984).

The Third Circuit has never determined whether the Pennsylvania legislature intended

the MAA to displace the antitrust laws.  Nor have the Pennsylvania courts established that the

MAA authorizes anticompetitive contracts.  Recently, this Court held that the state-action

doctrine applied to actions taken by SARAA pursuant to its eminent domain powers under the

MAA.  Pennsylvania v. Susquehanna Area Reg'l Airport Auth., 423 F. Supp. 2d 472 (M.D. Pa.

2006) ("SARAA I").  In reaching that conclusion, this Court reasoned:

> That anticompetitive effects are a foreseeable result of an authority's power to take property by eminent domain is obvious.  It cannot reasonably be disputed that the exercise of this power may result in the displacement of competitive facilities.  Indeed, the topography or characteristics of a tract of land may make it uniquely suited for particular projects or facilities.  Logically, private and public entities may be equally enamored with a specific location because of its suitability for a particular purpose.

SARAA I, 423 F. Supp. 2d at 479.

Defendants rely on SARAA I for the proposition that "[u]nder the MAA, SARAA is

expressly authorized to enter into contracts, including exclusive contracts for ground

transportation services."  (Doc. No. 16, at 17.)  This argument fails however because in

SARAA I, this Court relied expressly upon the Pennsylvania Supreme Court opinion in

Thompson Appeal that "the deliberate omission of the power to acquire and hold property from

the anticompetitive provision shows a clear legislative design that the proviso was not to be a

restriction upon the authority's right to condemn."  SARAA I, 423 F. Supp. 2d at 480 (emphasis

in original) (quoting Thompson Appeal, 233 A.2d at 239).  This Court's conclusion in SARAA I

that the state-action doctrine shielded SARAA rested upon a recognition that the Pennsylvania

legislature not only contemplated anticompetitive conduct in the exercise of eminent-domain

power but also specifically provided for such anticompetitive conduct.

The present case is very different.  Unlike eminent domain, where the Pennsylvania

legislature evinced a clear intent to displace competition, the delegation of the naked power to

contract does not suggest that the Pennsylvania legislature intended to permit SARAA to enter

into contracts that would violate federal antitrust laws.  Put another way, it is not a logical result

of the power to contract, even if exercised reasonably, that SARAA should displace competition. Cf. Surgical Care Ctr., 171 F.2d at 235 ("Not all joint ventures are anticompetitive.  Thus, it is not the foreseeable result of allowing a hospital service district to form joint ventures that it will engage in anticompetitive conduct.").

Defendants suggest a decision declining to apply the state-action doctrine to SARAA in this case would conflict with decisions from other circuits.  To the contrary, the cases cited by Defendants involved enabling statutes specifically authorizing the regulation of passenger pickup.[7]  The enabling statute in this case merely delegates the general power to contract, which does not expressly or impliedly mandate the power to enter into competition-displacing contracts, even if such contracts are permissible.  At most, the MAA's language is neutral as to the possibility of antitrust liability in this case.

Therefore, the Court holds that the state-action doctrine does not shield SARAA from antitrust liability in this case.

---

[7] See Allright Colorado, Inc. v. Denver, 937 F.2d 1502, 1508 (10th Cir. 1991) (granting power "to regulate the receipt, deposit, and removal and the embarkation of passengers or property to or from such airports; to exact and require charges, fees, and tolls, . . ."); Executive Town & Country Svcs., Inc. v. Atlanta, 789 F.2d 1523, 1530 (11th Cir. 1986) (corporate charter authorized city "[t]o regulate and license vehicles operated for hire in the City; to limit the number of such vehicles; to require the operators thereof to be licensed; to require public liability insurance on such vehicles in amounts prescribed by ordinance; to regulate and rent parking spaces in public ways for the use of such vehicles; to regulate transportation lines and terminals, pedestrian and vehicle traffic, parking and common carriers."); see also Indep. Taxicab Drivers' Employees v. Greater Houston Transp. Co., 760 F.2d 607, 610 (5th Cir. 1985) (authorizing the municipality "to regulate, license and fix the charges and fares made by any person owning, operating or controlling any vehicle of any character used for the carrying of passengers for hire or the transportation of freight for hire on the public streets and alleys of the city").

**2.** **Local Government Antitrust Act**

Finding that the state-action doctrine does not shield Defendants from antitrust liability, the Court next turns to whether Plaintiffs' claims may proceed under the Local Government Antitrust Act of 1984 ("LGAA"), Pub. L. No. 98-544, 15 U.S.C. §§ 34-36.  Defendants contend that they are not subject to suit because the Act eliminated the availability of a monetary-damages remedy against local governmental entities, and in their amended complaint, Plaintiffs do not seek relief beyond compensatory and punitive damages.

The LGAA provides, <u>inter alia</u>, that:

> No damages, interest on damages, costs, or attorney's fees may be recovered under section 4, 4A, or 4C of the Clayton Act (15 U.S.C. 15, 15a, or 15c) from any local government, or official or employee thereof acting in an official capacity.

15 U.S.C. § 35(a).  On its face, the LGAA bars Plaintiffs from seeking damages for antitrust violations.  <u>Palm Springs Medical Clinic, Inc. v. Desert Hospital</u>, 628 F. Supp. 454, 458 (C.D. Cal. 1986) ("Section 4 of the Clayton Act is the damages remedy for violations of the Sherman Act.").  Unlike the state-action doctrine, the LGAA does not completely bar relief to Plaintiffs; rather, the LGAA simply limits the type of remedies available to Plaintiffs.  While the LGAA bars claims for monetary damages for violations of the antitrust laws, it does not limit the availability of injunctive relief.  Thus, because Plaintiffs' amended complaint seeks compensatory and punitive damages, but not injunctive relief, the LGAA bars their claims.

Plaintiffs do not dispute that the LGAA bars claims for monetary damages.  Instead, they argue that SARAA is not a "local government" for purposes of the Act.  The legislative history of the Act, however, suggests otherwise.  <u>See</u> <u>Palm Springs</u>, 628 F. Supp. at 462 (concluding that "both the House and Senate passed the final version of the [Local Government Antitrust] Act with the intent that local government immunity be blanket and absolute.").  The Court ultimately

20

agrees with the conclusion of then-District Judge Van Antwerpen, that when it passed the LGAA, "Congress intended to create an absolute immunity for the conduct of a municipal authority, at least as far as monetary damages are concerned." Northeast Jet Ctr., Ltd., v. Lehigh-Northampton Airport Auth., 767 F. Supp. 672, 681 (E.D. Pa. 1991).

In summary, the Court holds that the state-action doctrine does not exempt SARAA from antitrust liability in this case.[8] However, to the extent that Plaintiffs seek solely to recover damages from Defendants, the LGAA bars their antitrust claim. Therefore, Plaintiffs' antitrust claims against Defendants SARAA, Testa, and Hicks will be dismissed without prejudice.

### B.     Count II - Equal Protection

Plaintiffs also claim that Defendants violated the equal protection clause of the Fourteenth Amendment by denying Capital City access to the HIA terminal. Defendants move to dismiss Plaintiffs' equal protection claims on two grounds. First, Defendants argue that Plaintiffs cannot state a claim because Plaintiffs have not been deprived of any constitutionally protected rights.[9] Second, Defendants argue that Plaintiffs have not been treated differently from other similarly situated entities.

The equal protection clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend.

---

[8] Although the state-action doctrine does not apply in this case, it bears repeating that "the power to contract certainly implies the power to enter into exclusive provider agreements, because the great majority of such agreements are lawful." Areeda & Hovenkamp, supra.

[9] Defendants and Plaintiffs spill a great deal of ink in their briefs about whether Plaintiffs are entitled to a constitutionally protected property interest in "PUC's grant of a Certificate of Public Convenience." (Doc. No. 16, at 9.) However, Plaintiffs do not raise due process or takings clause violations in either their original or amended complaints. The Court therefore limits its holding Defendants' arguments related to whether Plaintiffs have stated an equal protection claim.

XIV.  To state a claim under the equal protection clause, a plaintiff must show that he "received different treatment from that received by other individuals similarly situated."  <u>Shuman v. Penn Manor Sch. Dist.</u>, 422 F.3d 141, 151 (3d Cir. 2005) (citing <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985)).  Additionally, under settled Supreme Court jurisprudence, "[u]nless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, [courts are to] presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest."  <u>City of New Orleans v. Dukes</u>, 427 U.S. 297, 303-04 (1979).

In this case, Plaintiffs allege that SARAA denied Capital City access to HIA's terminal "because of the racial/ethnic status of Capital City's owner and many of its drivers."  (Doc. No. 16, at 11.)  The gravamen of Plaintiffs' complaint is that SARAA treated Capital City differently from American Taxi because Ayal Salame is Israeli-born.[10]  Even assuming <u>arguendo</u> that Salame is a member of a protected class, Plaintiffs' amended complaint does not sufficiently allege that Capital City was treated differently <u>because</u> of his membership in a protected class. As the Supreme Court has repeatedly recognized, the "Fourteenth Amendment guarantees equal laws, not equal results."  <u>Personnel Adm'r of Massachusetts v. Feeney</u>, 442 U.S. 256, 273 (1979).

Beyond Plaintiffs' bare assertions, the amended complaint does not allege that Plaintiffs received treatment different from those similarly situated.  The amended complaint plainly

---

[10] The amended complaint does not itself claim that American Taxi and Capital City are similarly situated.  Moreover, the amended complaint does not raise allegations that Capital City received treatment different from other common carriers seeking outgoing fares.

suggests that SARAA prohibited <u>all</u> common carriers, not just Capital City, from accessing the HIA terminal because SARAA had already granted American Taxi exclusive access to outgoing fares.[11] (Doc No. 9, ¶¶ 22(a), 22(c), 24, 25.)  Finally, Capital City has not alleged in its amended complaint that American Taxi received preferential treatment on the basis of race or ethnicity. Even under a liberal reading of the amended complaint, Plaintiffs have failed to allege that the race or ethnicity of Salame or any of his drivers in any way affected Defendants' decision to exclude Capital City from accessing outbound fares.  Therefore, based on the pleadings, the Court will dismiss Plaintiffs' equal protection claim.

**III.   CONCLUSION**

For the foregoing reasons, the Court will grant Defendants' motion to dismiss Plaintiffs' claims against Defendants SARAA, Testa, and Hicks.  However, the Court will permit Plaintiffs ten days within which to file a motion for leave to amend the complaint pursuant to Local Rule 15.1.  An appropriate order follows.

---

[11] Whether SARAA is able to alter the coverage area of a certified utility is a question of state law, not an issue of equal protection.  <u>SARAA v. PUC</u>, slip op. at 22.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CAPITAL CITY CAB SERVICE, INC.,** | **:** | |
| **and AYAL SALAME** | **:** | |
| **Plaintiffs,** | **:** | **CIVIL ACTION NO. 1:06-CV-00671** |
| | **:** | |
| **v.** | **:** | **(Chief Judge Kane)** |
| | **:** | |
| **SUSQUEHANNA AREA REGIONAL** | **:** | |
| **AIRPORT AUTHORITY, et al.,** | **:** | |
| **Defendants.** | **:** | |

## ORDER

**AND NOW**, this 27th day of November 2006, upon consideration of Defendants' Motion to Dismiss (Doc. No. 11) filed in the above-captioned matter, and for the reasons set forth in this Court's Memorandum Opinion filed herewith, **IT IS HEREBY ORDERED** that said Motion is **GRANTED**.  **IT IS FURTHER ORDERED** that Defendants Susquehanna Area Regional Airport Authority, Alfred Testa, and Randy Hicks are **DISMISSED** from this action.  **IT IS FURTHER ORDERED** that Plaintiffs shall be permitted to file a motion for leave to amend Plaintiffs' amended complaint within ten (10) days from the date of this Order.  In the event Plaintiffs fail to file such a motion in accordance with this Order, the case shall be dismissed without further notice.

      s/ Yvette Kane_____
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania